J-A04008-19

2019 PA Super 336

| | | |
|---|---|---|
| LOUIS FARESE AND KATHARINE FARESE | : : : : : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | | |
| JAMES ROBINSON AND VENTURI TECHNOLOGIES, INC. | | No. 145 EDA 2018 |
| Appellants | | |

Appeal from the Judgment Entered December 4, 2017
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  April 2015 No. 01084

BEFORE:   LAZARUS, J., KUNSELMAN, J., and COLINS, J.*

OPINION BY COLINS, J.:                    **FILED NOVEMBER 08, 2019**

Appellants, James Robinson and Venturi Technologies, Inc. ("Venturi"), appeal from the judgment entered December 4, 2017, after a jury awarded Appellees, Louis Farese ("Mr. Farese") and Katharine Farese ("Ms. Farese"), husband and wife, compensatory damages in the underlying negligence action totaling $2,579,000.00.  We affirm.

The facts underlying this appeal are as follows.  On August 29, 2014, Mr. Farese was involved in a motor vehicle collision in Delaware County after his 1998 Ford Mustang convertible was struck from behind by a work van owned by Venturi and operated by Robinson.  The impact from the collision caused Mr. Farese's vehicle to turn over onto its convertible roof and the airbags to deploy.  At the time of the collision, Robinson was employed by

---

* Retired Senior Judge assigned to the Superior Court.

Venturi and was acting within the scope, course, and furtherance of his employment and with the permission and knowledge of Venturi. Mr. Farese was transported from the collision scene to the hospital where he complained of left forearm, back, and facial pain to hospital personnel. Mr. Farese was evaluated, x-rayed, and released later that day. He was diagnosed with back strain, forearm contusion, and neck strain, prescribed Motrin, and instructed to follow up with his primary care physician as soon as possible. Four days after the collision, Mr. Farese began treatment with Dr. Robert Sing, a sports medicine doctor, for neck pain, back pain, and headaches; he would later receive treatment from a spinal surgeon, a neurologist, and a pain management specialist, as well. At the time of the collision, Mr. Farese was part-owner of Nick and Lou's Pines Diner in Clifton Heights, Delaware County, which is open seven days a week.

On April 13, 2015, Appellees commenced this action by complaint. Count I of the complaint alleged:

> As a result of the aforesaid collision, which was caused by the recklessness, carelessness and negligence of [Appellants], as aforesaid, [Mr.] Farese[] suffered injuries which are serious, severe and permanent, including, but not limited to: cervical disc herniations, lumbar disc herniations, lumbar strain and sprain, thoracic strain and sprain, cervical strain and sprain, forearm contusion, left wrist strain and sprain, concussion, post–concussive syndrome, headache syndrome, aggravation, acceleration and/or activation of any pre-existing condition or conditions regarding same, as well as a severe shock to [his] emotional, psychological and nervous systems, all of which have caused, continue to cause and probably in the future will cause [him] great pain and agony.

- 2 -

Complaint, 4/13/2015, at ¶ 12. In Count II of the complaint, Ms. Farese sought compensation for her husband's injuries that "deprived [her of his] assistance, comfort, society and consortium." *Id.* at ¶ 16.

On November 17, 2015, the parties signed an agreement wherein Appellants stipulated to: (1) their negligence for causing the motor vehicle collision involving Mr. Farese; (2) the fact that Appellees were not comparatively negligent; and (3) Appellants' negligence being a factual cause of Mr. Farese's injuries. Stipulation, 11/17/2015, at ¶¶ 1-2. Appellants also reserved the right to challenge the nature and extent of any injuries claimed by Appellees. A jury trial would thereby be held solely on the issue of compensatory damages.

In their proposed jury instructions, submitted on September 19, 2016, Appellants requested the following charge:

> You may not include in any award to the Plaintiff any amount that you might add for the purpose of punishing Defendant or to serve as an example or warning for others. Such damages would be punitive, and are not authorized. ***Wildman v. Burlington Northern R. Co.***, 825 F.2d 1392 (9th Cir. 1987); ***Kozar v. Chesapeake & Ohio Ry.***, 449 F.2d 1238, 1240 (6th Cir. 1974); ***Matter of Mardoc Asbestos Case Clusters 1, 2, 5 and 6***, 768 F.Supp. 595, 597 (E.D. Mich. 1991); ***Toscano v. Burlington Northern R. Co.***, 678 F.Supp. 1477, 1479 (D. Mont. 1987).

Appellants' Proposed Jury Instructions, 9/19/2016, No. 14.

On September 21, 2016, Appellants filed a motion *in limine* to preclude the testimony of two of Appellees' expert witnesses, Dr. Nirav Shah and Dr. Andrew Shaer, on the basis that their testimony would be cumulative. The trial court granted the motion as to Dr. Shah but denied it as to Dr. Shaer,

because "Dr. Shaer is a radiologist and reading those films, [Appellees a]re allowed to bring him in to give a reading as to that." N.T., 9/27/2016, at 8.

During oral argument on this motion, Appellants' counsel mentioned that they intended to call Dr. Lee Harris as an expert to refute Appellees' medical experts. *Id.* at 24.

The jury trial commenced on September 27, 2016. After Appellees' counsel stated during his opening that Appellants "have a low value for human well-being[,]" the trial court sustained Appellants' objection and instantly instructed jury: "You're to disregard that last statement." N.T., 9/27/2016, at 63-64; *see also id.* at 67 (trial court suggests that grounds may exist for a mistrial). Appellees' counsel then stated that Appellants "know [Mr. Farese] needs ongoing medical treatment. They don't want him to have it. They don't want to pay for it. . . . The last reason we're here is because [Appellants] refused to provide full and fair compensation. We're forced to bring them to trial." *Id.* at 64, 69-70. Appellants' counsel immediately moved for a mistrial, claiming that Appellees' counsel's statements improperly injected the issue of punitive damages into the case before the jury. *Id.* at 70 (objection), 71 (defense counsel specifically moves for mistrial), 73 (defense counsel asks trial court for a specific ruling on the motion for mistrial). The trial court denied the motion. *Id.* at 73. Appellees' counsel concluded: "[Appellants] know how expensive this is. They bring us to court." *Id.* at 74. Appellees' counsel also attacked the credibility of Dr. Harris, in anticipation of Appellants calling him to testify. *Id.* at 89-90.

During trial, the jury saw filmed testimony of Dr. Michael Cohen, *id.* at 118, who diagnosed Mr. Farese as having post-concussion syndrome. Trial Court Opinion ("TCO"), filed September 6, 2018, at 31 (citing N.T., Cohen Testimony, 5/20/2016, at 26). Dr. Cohen "explained that if a brain injury lasts more than one year there is evidence to suggest this injury would be considered permanent." *Id.* (citing N.T., Cohen Testimony, 5/20/2016, at 26).

> The jury also heard from neuroradiologist Dr. Andrew Shaer, who conducted a study on the MRI results of [Mr. Farese]. Dr. Shaer offered his expert opinion, consistent with that of the other doctors, that [Mr. Farese] has a disc herniation at C6-7 without bone spurs whose signal intensity is greater than that of its disc origin. Shaer Testimony 5/24/2016 at 34. These results are consistent with a finding resulting from a recent traumatic event - the motor vehicle collision that occurred on August 29, 2014. *Id.*

*Id.* at 32.

Dr. Sing testified that a magnetic resonance image ("MRI") of Mr. Farese's cervical spine showed degenerative disk disease with acute herniations at C6-7 and lower neck disc rupture. N.T., 9/28/2016, at 48.

The jury also watched pre-recorded testimony from Dr. Christian Fras, who "offered his expert opinion that [Mr. Farese] sustained injuries of a cervical disc herniation, aggravation of cervical and lumbar spondylosis[1] and a new finding of annular tear at L4-5 directly related to the motor vehicle collision." TCO, filed September 6, 2018, at 31 (citing N.T., Fras Testimony,

---

[1] Spondylosis refers to degenerative spinal changes. *See* https://medical-dictionary.thefreedictionary.com/spondylosis (last visited 10/2/2019).

7/29/2016, at 19, 25-26). Dr. Fras "acknowledged that [Mr. Farese] is a surgical candidate and very well could require surgery to both the cervical and lumbar spine." *Id.* (citing N.T., Fras Testimony, 7/29/2016, at 25).

Mr. Farese's business partner, Nick Piscitelli, testified that, before the collision, he and Mr. Farese split the duties at the diner that they co-owned, including opening the diner in the mornings, seating customers, doing inventory, meeting with food suppliers, handling personnel issues, working the cash register, and interacting with the customers. N.T., 9/30/2016, at 8, 11-12. Piscitelli testified that, after the collision, Mr. Farese had to miss work to go to specialists and physical therapy two to three times per week, causing Piscitelli to have to do the majority of the work at the diner and put in long hours. *Id.* at 22. Piscitelli also testified that since the collision, Mr. Farese cannot do any heavy lifting or physical activities associated with his job at the diner. *Id.* at 24.

Ms. Farese testified that her husband used to "help[ her] around the house" but now becomes "easily agitated [and has] mood swings" and will often "walk away mid[-]conversation" when a headache begins; she added that her "physical relationship [with him] isn't what it used to be . . . things just aren't the same between us as they used to be." N.T., 9/30/2016, at 46-48. "During cross-examination of [Ms.] Farese, [Appellants'] counsel . . . focus[ed] his questions upon issues regarding Mr. Farese's injuries, medications, presence at medical appointments, his general health before and

after the injuries, and the injuries' impact on Mr. Farese's employment." TCO,

filed September 6, 2016, at 36 (citing N.T., 9/30/2016, at 50-54).[2]

Farese himself testified that, at the time of trial, he was 50 years old.

N.T., 9/30/2016, at 55.

> Mr. Farese testified that before the collision, he did not see[] any specialists for medical problems, was not taking medications, and was not receiving injections. [N.T., 9/30/2016,] at 67-68. . . . Mr. Farese specifically state[d,] "I never had an issue ... I was in great physical health. Never any problems. The thing they mentioned about the degenerative things and whatnot. If anything was there, never experienced any sign" of those problems before. *Id.* at 67.
>
> After the motor vehicle collision caused by [Appellees], Mr. Farese suffered a swollen left wrist, neck pain, back pain and head pain. [*Id.*] at 71. Mr. Farese describe[d] these headaches as "being extremely profound to the point where [the headache] completely disables me. I got to go lay down," and at other times as though his "skull was going to explode." *Id.* at 100. Regarding his headaches, Mr. Farese stated they "could last the entire night. Could last the entire day. Couple very isolated incidents, I've had them an entire day, all day into night." *Id.* Further, the headaches "interfere with everything. It's very debilitating. Interrupts – forgetting about putting activities aside, even sleep." *Id.* Mr. Farese, regarding his neck pain, experiences very stiff achy pain in his neck all day which he treats with heat and a [transcutaneous electrical nerve stimulation] unit. *Id.* at 102. For instance, if Mr. Farese "move[s his] head too far in one direction, it sends a shooting pain into [his] neck." *Id.* at 103. He also experiences similar low back pain and has difficulty sitting for long periods of time. *Id.* . . . The injuries forced him to undergo physical therapy approximately three times per week for seven months. *Id.* at 76. Despite being healthy before the collision, Mr. Farese was prescribed several prescription medications including: Fioricet, Imitrex, Cambia, Sumatriptan and Meloxicam. *Id.* at 75, 80. Mr. Farese testified that the Cambia powder "made

---

[2] The trial court opinion cites to the notes of testimony for October 3, 2016, but, pursuant to our review of the record, we believe that this date is a typographical error and that the trial court intended to cite to the notes of testimony for September 30, 2016.

[him] nauseous, like he was going to be sick from either end." *Id.* at 81. Even the most mild of the prescription medications had adverse side effects "which made [his] stomach mildly upset[.]" *Id.* Mr. Farese still takes that medication, Meloxicam, daily with food. *Id.*

Regarding his treatments, Mr. Farese stated that he understood from his spinal surgeon, Dr. Fras, that he may require both neck and back surgery in the future. *Id.* at 82. Mr. Farese testified about his lumbar facet injections, which [are] three needles each time, and has had three series thus far and another scheduled. *Id.* at 85. Mr. Farese testified about the trigger point injections that he received in his upper neck and head. *Id.* Also, Mr. Farese described the process of occipital block injections wherein a "needle [is] put into your skull, the very base of your skull, put it in there. Not pleasant either." *Id.*

TCO, filed September 6, 2018, at 27-29.

Mr. Farese further testified that, prior to the collision, he was active, playing pick-up football games with his friends, working out at his home gym three times per week, running regularly, coaching his children in sports, and caring for his aging parents but that he now has difficulty even picking up bags when food shopping. N.T., 9/30/2016, at 58, 61, 63, 67, 93-94; *see also* TCO, filed September 6, 2018, at 29. Mr. Farese also testified that the collision has had an emotional and social impact on him, his children, and his relationship with his wife, stating that his circumstances are "embarrassing and humiliating . . . even with [his] wife. Whether it's out or home. You still feel a certain way when you can't do certain things[.]" N.T., 9/30/2016, at 74, 91-94, 98; *see also* TCO, filed September 6, 2018, at 29. "Mr. Farese stated that his attendance to family events or movies has been significantly reduced because '[i]t's always in the back of my head. I hope I don't get a

headache ... it's definitely cut down on a lot of social activities."  TCO, filed September 6, 2018, at 29 (quoting N.T., 9/30/2016, at 98).

The defense rested without calling any witnesses, including Dr. Harris. N.T., 9/30/2016, at 111.

Prior to closing argument, the trial court instructed the jury:  "[T]hese arguments are not evidence[.]"  N.T., 10/3/2016, at 55.

In closing his closing argument, Appellees' counsel made the following remarks:

> They're calling Mr. Farese a fraud.  That's what they're saying he is here in court, a fraud. . . . Shame on them for doing this to him, for what they've put him through for the past years and what he has to go through for the next at least 30 years and what they've done to him in this courtroom.
>
> Shame on those defendants for doing this to him. . . .
>
> They brought him to court, and the part about this that really is so aggravating to Mr. Farese and his family is that this saying that they've agreed to negligence, it wasn't always like that. . . . They didn't want to agree until they were forced to about what happened here. . . . They blamed Mr. Farese for what happened. They then go and file, if an accident occurred in the manner alleged by [Appellees], then such accident occurred as a result of the negligence of the plaintiff, Mr. Louis Farese.
>
> Are you kidding me?  This is what this gentleman has been tormented for in the past years.  They knew exactly what they were doing.  This case was going to court from day one and he had to do everything possible to protect himself from how he was being treated.
>
> What sort of people slams [sic] somebody in the rear, causes the car to flip up in the air, causes injury to these people and then says, let's make up an excuse, let's come up with some reason why we don't have to pay them as much money as they're entitled to. . . . They could care less about what they did to Mr. Farese, trying to make him look like he's not hurt that bad. . . . [T]his is how he gets treated by these people.

You know what? The thought always is, well, let's throw out what we can, let's say that we're responsible for the accident. Because maybe the jury will like us if we do that so we can save some money.

That's not taking responsibility for anything, ladies and gentlemen. . . . These people didn't even bother to show up to court. . . . [T]hey don't even have the courtesy to show up here.

Responsibility is paying in full for what you did . . . what these people are doing here, trying to avoid what their responsibility is.

They're hiding from it. . . . You see, [Appellants] also have no limits on how they attack someone's character. . . . [W]hat's crazy is having to spend $5,000 to pay a doctor to come in here. . . . What's crazy is forcing us to do that, and people like Venturi with companies like that and people like Mr. Robinson, they know this. What they also know is there's a certain amount of people that can't do it. . . . You may be outraged by it. You should be. That's a lot of money to have to spend. But those are the crazy numbers.

*Id.* at 59, 61-66, 71. Appellants' counsel objected to these remarks but never explicitly moved for a mistrial or new trial. *Id.* at 71. After the trial court sustained Appellants' objection, *id.* at 71-72, it then immediately admonished Appellees' counsel, "You can't talk about what it cost you to bring a case to trial. . . . I don't want any other references to cost of litigation." *Id.* at 72-73. The trial court then told Appellants, "If you want to give me a curative instruction before we break for lunch, before I charge." *Id.* at 73.

Appellees' counsel's closing argument continued:

This is about real human suffering that's going on and [Appellants] just don't want to pay for it. That's the bottom line. . . . What you don't hear about is what is called frivolous defenses. Making up things for litigation. Coming in and telling you things that aren't true.

*Id.* at 88, 90. Appellants' counsel objected but, again, never overtly asked for a mistrial to be declared. *Id.* at 90. The trial court told Appellees' counsel:

- 10 -

"I will preclude you from attacking him further with frivolous. [sic] He's disputing the nature and extent of the injuries." *Id.* at 91. Appellees' counsel then concluded his closing argument:

> How [Appellants] view human well-being is in your hands. The only tool that you have that you're giving in our judicial system is one by entering a full and fair award. That will be the determinant for these people to follow the rules.
>
> Society is going to have to know any time they're driving in front of a Venturi Technologies truck, they're going to be okay. These people have to know they need to spend more money on making the highway safe for other motorists than come to court and trying to protect their money now.
>
> Protecting money can never be more important than protecting the safety and well-being of a human being. . . . What they've taken away from [Mr. Farese] is his good name, a good name he's enjoyed before he got involved with any of this. To prevent the amount of money. They've put Mr. Farese's good name in jeopardy in public. . . . It's all to protect their money. They'll do anything to protect that money. Blame people and tell the jury things they shouldn't be telling him.
>
> You see, it just didn't stop there. It wasn't just [Mr. Farese] they attacked in court here. It was his doctors too. . . .
>
> His good name will be vindicated by you.
>
> That's what he wants. The doctors will be vindicated by you. That's what they want.

*Id.* at 94, 96-98.

> During his closing argument, Appellants' counsel stated,
>
> In my opening, I discussed Dr. Harris. It became pretty clear to me that you have all paid close attention to all witnesses here, and I think you understand what's going on here, and I again saw no need to bring in another doctor to add on what was happening here.

*Id.* at 112-13. Appellants' counsel never mentioned Ms. Farese once during his opening statement or closing argument.

- 11 -

Prior to the final jury charge, the trial court asked Appellants: "Lastly, you want a curative instruction on something. Draft something. Run it by counsel and see what we can do with this?" *Id.* at 146. Appellants answered, "Yes, Your Honor, thank you." *Id.* Nothing on record indicates that Appellants ever provided the trial court with any such instructions.

During the final charge, the trial court instructed the jury that Mr. Farese was entitled to be "fairly and adequately compensated for all" physical harm, mental anguish, inconvenience and past and future distress, embarrassment and humiliation, and loss of ability to enjoy life's pleasures. *Id.* at 160-61. The court also listed the factors to consider when awarding compensatory damages: Mr. Farese's age; the severity of his injuries; whether his injuries are temporary or permanent; the extent to which his injuries affect his ability to perform basic activities of daily living; the duration and nature of his medical treatment; the duration and extent of his physical pain and mental anguish (past and future); and his health and physical condition prior to injuries. *Id.* at 161-62. The trial court then provided the following instruction to the jury when considering the consortium claim:

> [Mr. Farese]'s spouse is entitled to be compensated for the past, present and future loss of the injuries to her, and the past, present, and future loss of companionship of her spouse. Consortium claims are losses arising out of the marital relationship. Consortium is the marital fellowship of a husband and wife and including the company, society, cooperation, affection and aid of the other in the marital relationship. Such claims include a loss of support, comfort and assistance. The loss of association and companionship and the loss of ability to engage in sexual relations.

*Id.* at 162. The trial court's final charge to the jury was: "You should keep your deliberations free of any bias or prejudice." *Id.* at 169. There is no indication in the record that the court issued that Appellants' proposed instruction No. 14.

On October 3, 2016, the jury found Appellees were entitled to $2,579,000.00 in compensatory damages -- $1,248,000.00 for non-economic damages; $900,000.00 for future medical bills; $15,000.00 for past medical bills; and $416,000.00 for loss of consortium to Ms. Farese. Appellants filed timely post-trial motions seeking a new trial or, in the alternative, remittitur of the jury's verdict. The trial court denied the motions on November 29, 2017. Judgment on the verdict was entered on December 4, 2017. Appellants filed this timely direct appeal on December 28, 2017.[3]

Appellant presents the following issues for our review:

1. Did the trial court err and abuse its discretion in failing to grant a new trial on damages, where [Appellees'] counsel repeatedly made improper, inflammatory, offensive and highly prejudicial comments and arguments?

2. Did the trial court err and abuse its discretion in failing to grant a new trial on damages after the trial court, over [Appellants'] objection, allowed four (4) different physician experts to give cumulative and repetitive opinion testimony regarding their readings of the same MRI, to the unfair prejudice of [Appellants]?

3. Did the trial court err and abuse its discretion in failing to grant a new trial on damages to the admission of improper evidence regarding the amounts of future medical bills, which

_____

[3] Appellants filed their statement of errors complained of on appeal on February 16, 2018. The trial court entered its opinion on September 6, 2018.

evidence violated the Pennsylvania Motor Vehicle Financial Responsibility Law?

4.    Did the trial court err and abuse its discretion in failing to grant a new trial on damages [where] the verdict was [shockingly excessive and could only have been the result of passion, prejudice or other impermissible factors]?[4]

Appellants' Brief at 4, 55 (suggested answers omitted).

### Appellees' Counsel's Opening Statement and Closing Argument

In reviewing a trial court's denial of a motion for a new trial, the standard of review for an appellate court is as follows:

> [I]t is well-established law that, absent a clear abuse of discretion by the trial court, appellate courts must not interfere with the trial court's authority to grant or deny a new trial. . . . Thus, when analyzing a decision by a trial court to grant or deny a new trial, the proper standard of review, ultimately, is whether the trial court abused its discretion. . . . We must review the court's alleged mistake and determine whether the court erred and, if so, whether the error resulted in prejudice necessitating a new trial.  If the alleged mistake concerned an error of law, we will scrutinize for legal error.  Once we determine whether an error occurred, we must then determine whether the trial court abused its discretion in ruling on the request for a new trial.

*ACE American Insurance Co. v. Underwriters at Lloyds and Cos.*, 939 A.2d 935, 939 (Pa. Super. 2007) (citations omitted).

Appellants first complain that the trial court erred in failing to order a new trial where Appellees' counsel was "permitted to make highly

_____

4 Appellants' fourth issue is not included in their Statement of Questions Presented.  However, it is clearly stated on page 55 of their appellate brief and also in their Rule 1925(b) concise statement.  It is evident that they inadvertently restated issue three in their Statement of Questions Presented on page 4 of their brief.  Thus, we have substituted the proper issue as their fourth issue in their Statement of Questions Presented.

inflammatory and improper arguments [in opening and closing statements] that were intended to, and did, lead the jury to an excessive verdict[5] based on passion and prejudice." Appellants' Brief at 11; *see also id.* at 16-27 (citing N.T., 9/27/2016, at 63-64, 69-70, 74; N.T., 10/3/2016, at 59-66, 71, 88, 90, 96-98) (referring to Appellees' counsel's opening statement as "improper and inflammatory" and closing argument as "outrageous[,]" "florid and inflammatory[,]" as well as containing "personal attacks"). Specifically, Appellants contend that Appellees' counsel impermissibly put the issue of punitive damages before the jury where the case was strictly a trial on compensatory damages. *Id.* at 16-18, 26 (citing N.T., 9/27/2016, at 63-64, 69-70; N.T., 10/3/2016, at 94).

"It is the duty of the trial judge to take affirmative steps to attempt to cure harm, once an offensive remark has been objected to." *Young v. Washington Hospital*, 761 A.2d 559, 561-62 (Pa. Super. 2000). Additionally, "[i]t is well settled that the jury is presumed to follow the trial

---

5 In *Tindall v. Friedman*, 970 A.2d 1159 (Pa. Super. 2009), our Court reiterated:

> The grant or refusal of a new trial due to the excessiveness of the verdict is within the discretion of the trial court. An appellate court will not find a verdict excessive unless it is so grossly excessive as to shock our sense of justice. The appellate court begins with the premise that large verdicts are not necessarily excessive verdicts. Each case is unique and dependent on its own special circumstances and a court should apply only those factors which it finds to be relevant in determining whether or not the verdict is excessive.

*Id.* at 1177 (citations omitted).

- 15 -

court's instructions." ***Commonwealth v. Cash***, 137 A.3d 1262, 1280 (Pa. 2016).

The trial court took such affirmative steps to cure any harm by either instantaneously instructing the jury to disregard Appellees' comments or by repeatedly offering to issue curative instructions – even allowing Appellants to craft the wording of the instructions – but Appellants failed to follow through by providing the trial court with any suggested language. ***See Young***, 761 A.2d at 561-62. Where the trial court promptly instructed the jury, we presume that the jury followed the trial court's instructions, ***see Cash***, 137 A.3d at 1280, and Appellants, like the appellant in ***Cash***, did "not otherwise attempt to offer any evidence establishing that the jury failed to do so[.]" ***Id.***

After Appellees' counsel stated during his opening that Appellants "have a low value for human well-being[,]" the trial court sustained Appellants' objection and instantly instructed jury: "You're to disregard that last statement." N.T., 9/27/2016, at 63-64.

As for Appellees' counsel's closing argument, preliminarily, we observe that, unless a party has raised a specific objection and moved for mistrial at trial, then any right to a new trial is waived. ***McMillen v. 84 Lumber, Inc***., 649 A.2d 932, 934 (Pa. 1994). Appellants in the current action preserved their challenge to Appellees' counsel's opening statement, including specifically moving for a mistrial. N.T., 9/27/2016, at 63 (objection), 67 (trial court suggests that grounds may exist for a mistrial), 70 (objection again), 71 (Appellants' counsel specifically moves for mistrial), 73 (Appellants' counsel

asks trial court for a specific ruling on the motion for mistrial). However, Appellants failed to move for a mistrial or new trial during or after Appellees' counsel's closing argument. Appellants' counsel objected but never clearly requested a mistrial. N.T., 10/3/2016, at 71, 90. Thus, any request by Appellants for a new trial predicated upon Appellees' counsel's closing argument has been waived. **See McMillen**, 649 A.2d at 934.

Assuming any argument based upon Appellees' counsel's closing argument had not been waived, we note that, prior to closing argument, the trial court instructed the jury: "[T]hese arguments are not evidence[.]" N.T., 10/3/2016, at 55. To the degree that this preemptive standard instruction was insufficient to ameliorate any later problems with closing arguments, wherever such improper comments occurred, Appellants had the opportunity to request curative instructions, but there is no indication in the record that Appellants ever provided the trial court with such remedial instructions.[6] After the trial court sustained one of Appellants' objections to Appellees' summation, *id.* at 71-72, the trial court told Appellants, "If you want to give me a curative instruction before we break for lunch, before I charge[,]" then immediately admonished Appellees, "I don't want any other references to cost of litigation." *Id.* at 73. Again, prior to the final charge, the trial court asked

---

[6] To the extent that Appellants contend that, if given, their proposed instruction No. 14 would have served as a curative instruction, Appellants' Brief at 33, Appellants: (1) failed to draw this proposed instruction to the trial court's attention after the court repeatedly requested a curative instruction during and following closing arguments; and (2) more importantly, failed to raise any argument regarding proposed instruction No. 14 in their post-trial motions, consequently waiving any such claim.

Appellants: "Lastly, you want a curative instruction on something. Draft something. Run it by counsel and see what we can do with this?" *Id.* at 146. Appellants answered, "Yes, Your Honor, thank you." *Id.* However, nothing on record indicates that Appellants ever provided the trial court with any such instructions when given the opportunity to do so.

As for Appellants' contention that Appellees' counsel's remarks from opening statements and closing arguments prejudiced the jury, Appellants' Brief at 29, the trial court's final charge to the jury that "You should keep your deliberations free of any bias or prejudice" alleviated any such concern. N.T., 10/3/2016, at 169.

Accordingly, the trial court took the "affirmative steps" of immediately instructing the jury to disregard contested remarks from Appellants' opening statement and asking Appellants to draft curative instructions for inappropriate comments during closing argument, in addition to providing the standard warning that closing arguments are not evidence prior to the beginning of said arguments. *Young*, 761 A.2d at 561-62. Appellants have waived any right to protest a lack of curative instructions subsequent to Appellees' closing when this absence is a result of their own failure to proffer said instructions.

In conclusion, we agree with the trial court that, to the extent that Appellees' summation fanned the flames of prejudice, the blaze was "extinguished" through the trial court's "numerous and persistent efforts to ameliorate each transgression and preserve the integrity of the trial." TCO,

filed September 6, 2018, at 9; **Ferguson v. Morton**, 84 A.3d 715, 726 (Pa. Super. 2013).

## Expert Testimony

Next, Appellants argue that "a new trial on damages was required because [Appellees were] permitted to introduce unfairly cumulative and repetitive medical testimony." Appellants' Brief at 45.

Our standard of review for the challenges to the admission of expert testimony is as follows:

> The admission of expert testimony is a matter committed to the discretion of the trial court and will not be disturbed absent an abuse of that discretion. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

**Nobles v. Staples, Inc.**, 150 A.3d 110, 113 (Pa. Super. 2016) (citations and internal quotation marks omitted).

> Our Rules of Evidence vest the trial court with the authority to determine the admissibility of evidence as well as to control the scope of examination. **See Pittsburgh Const. Co. v. Griffith**, 834 A.2d 572, 585 (Pa.Super.2003). Rule 403 stresses the importance of clear, concise, and expeditious presentation, allowing for the exclusion of evidence that is confusing, cumulative, or unfairly prejudicial:
>
> > **Rule 403. Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time**
> >
> > Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Pa.R.E. 403. In addition, the Rules vest the trial court with the necessary discretion to limit a party's presentation in an effort to achieve a just result while avoiding duplication or waste of time:

> **Rule 611. Mode and order of interrogation and presentation**
>
> **(a) Control by court.** The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time and (3) protect witnesses from harassment or undue embarrassment.

Pa.R.E. 611.

***Rettger v. UPMC Shadyside***, 991 A.2d 915, 925 (Pa. Super. 2010).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Sean F. Kennedy, we conclude Appellants' second issue merits no relief. The trial court opinion comprehensively discusses and properly disposes of that question:

> The trial court, in its discretion, admitted the medical testimony of Dr. Andrew Shaer for [Appellees]. [Appellants] filed a Motion in Limine to Preclude the medical testimony of Dr. Shaer, not on the basis of irrelevant testimony, but rather because [Appellants] considered his testimony as cumulative in violation of Pa.R.E. 403. . . . Farese had an MRI study performed on October 29, 2014. The court admitted Dr. Shaer's testimony on the basis that his expertise is in the area of neuroradiology; this separates his testimony from any conception of being cumulative. The testimony provided by Dr. Shaer provided a nuanced opinion of the injuries sustained by Mr. Farese that better explained his injuries to the jury.
>
> As an additional matter, the trial court was mindful of potential cumulative evidence that could arise during testimony. This is one reason why the trial court precluded the testimony of Dr. Shah. . . .

> [T]he trial court now turns specifically to the testimony that was offered by Dr. Andrew Shaer. Dr. Shaer is a radiologist and neuroradiologist. This specialized training qualifies Dr. Shaer as an expert in the area of reading images of the brain and spine. Dr. Shaer did just this when he viewed the October 29, 2014 cervical MRI study conducted on Mr. Farese. The trial court found that because Dr. Shaer was the only radiologist that testified at trial, and with specific expertise in reading such images, such that his testimony was not cumulative or repetitive. This marks a specific departure from the testimony of the four other doctors that testified at trial. The other doctors did not possess the specialized knowledge and training that differentiated the medical opinion evidence Dr. Shaer provided.
>
> The distinguishing characteristic between the testimony of Dr. Shaer and the other doctors that testified at trial is the specialized training that qualifies him to provide such testimony. Dr. Shaer explained that other physicians, such as those that testified at trial, may look at the MRI studies that have been conducted on a patient; however, these physicians are not able to issue reports on such MRI studies. By extension, only radiologists are qualified to issue such reports. For this reason, the trial court found that "Dr. Shaer is a radiologist and reading those films, [Appellees a]re allowed to bring him in to give a reading as to that." N.T. 9/27/2016 at 8. The trial court was cognizant throughout the entire proceedings of cumulative testimony. The trial court found that because the testimony of Dr. Shaer differed from that of the other physicians, Dr. Shaer's testimony was neither needless or cumulative. Therefore, the trial court did not abuse its discretion in allowing the testimony of Dr. Andrew Shaer.

TCO, filed September 6, 2018, at 15-17. Accordingly, the trial court did not abuse its discretion by admitting the testimony of Dr. Shaer, and we cannot and will not disturb the trial court's decision absent an abuse of discretion. *Nobles*, 150 A.3d at 113.

### Motor Vehicle Financial Responsibility Law

- 21 -

Appellants further urge this Court to find that "a new trial[7] on damages [is] required because [Appellees were] permitted to introduce medical calculations that violated" the Pennsylvania Motor Vehicle Financial Responsibility Law ("MVFRL"), 75 Pa.C.S. §§ 1701-1799.7, by failing to reduce the amounts of future medical bills as required by the cost containment provision of the MVFRL, 75 Pa.C.S. § 1797. Appellants' Brief at 49-52.

> Section 1797 of the Law was substantially amended by the [MVFRL] of February 7, 1990, P.L. 11. Section 1797(a) now provides that "[a] person or institution providing treatment, accommodations, products or services to an injured person for an injury covered by liability or uninsured and underinsured benefits or first party medical benefits...." cannot receive payment for the treatment, accommodations, products, or services in excess of 110% of what Medicare would pay for comparable services or the provider's usual and customary charge, whichever is less. Section 1797(a) also prohibits a provider from billing the insured for the difference between the provider's full charge and the amount paid by the insurer. Section 1797(b) requires insurers to contract with a peer review organization (PRO) "for the purpose of confirming that such treatment, products, services or accommodations conform to the professional standards of performance and are medically necessary."

*Pennsylvania Medical Providers Association v. Foster*, 613 A.2d 51, 52 (Pa. Cmwlth. 1992).[8]

Preliminarily, we note that Appellants have provided us with no Pennsylvania case law – and our research has uncovered no precedents – allowing for a jury's award for future medical expenses to be molded pursuant

---

[7] Our standard of review from a denial of a new trial remains a clear abuse of discretion. *ACE American Insurance*, 939 A.2d at 939.

[8] Although we are not bound by the decisions of the Commonwealth Court, we quote this case, because we believe it contains the best and most concise summary of the content of Section 1797.

to the cost containment provision of the MVFRL. However, this Court and the Middle District of Pennsylvania have analyzed this question in non-precedential decisions. "Although we prefer to avoid citation to unreported opinions of any court," where there is a "scarcity of case law on [the] subject[,]" we are be "compel[led] . . . to consider all available writings on [the] topic." **Commonwealth v. Manivannan**, 186 A.3d 472, 486 n.9 (Pa. Super. 2018), *reargument denied* (July 7, 2018). Furthermore, "[a]lthough we are not bound by decisions from . . . courts in other jurisdictions, we may use them for guidance to the degree we find them useful, persuasive, and . . . not incompatible with Pennsylvania law." **Ferraro v. Temple University**, 185 A.3d 396, 404 (Pa. Super. 2018) (citing **Newell v. Montana West, Inc.**, 154 A.3d 819, 823 & n.6 (Pa. Super. 2017)), *reargument denied* (June 27, 2018); *see also Manivannan*, 186 A.3d at 483 ("When confronted with a question heretofore unaddressed by the courts of this Commonwealth, we may turn to the courts of other jurisdictions."). Upon our review of these cases, we have discovered that, whenever courts have considered the question of whether 75 Pa.C.S. § 1797 applies to future medical expenses, they have unanimously concluded that it does not.

In **DeOrio v. Juliano**, No. 530 EDA 2006, unpublished memorandum at 18 (Pa. Super. filed October 5, 2007), *reargument denied* (November 19, 2017), one of the appellants, David Juliano, raised the same argument as Appellants – *i.e.*, that the trial court erred in permitting expert testimony on estimated future medical expenses in a personal injury case without reduction

for the cost containment provision set forth in Section 1797. In addition, just like Appellants, Juliano contended that ***Pittsburgh Neurosurgery Associates v. Danner***, 733 A.2d 1279 (Pa. Super. 1999), supported his position. ***Compare*** Appellant's Brief at 50 ***with DeOrio***, No. 530 EDA 2006 at 19. This Court disagreed with Juliano's interpretation of ***Pittsburgh Neurosurgery***, as do we. ***DeOrio***, No. 530 EDA 2006 at 19.

In ***Pittsburgh Neurosurgery***, this Court concluded that the payment limitations in Section 1797 were applicable where a portion of the provider's bill for services was payable under the tortfeasor's automobile insurance liability coverage. 733 A.2d at 1284. This Court also observed that "[i]n the context of a jury trial, an injured party may introduce unpaid medical bills to a jury . . . and the amount introduced may not be subject to cost containment." ***Id.*** at 1285. Pursuant to this language, this Court in ***DeOrio*** concluded that ***Pittsburgh Neurosurgery*** "contradicts rather than supports Juliano's position." No. 530 EDA 2006 at 20. Based upon our own reading of ***Pittsburgh Neurosurgery***, we similarly find that said text contradicts rather than supports Appellants' position.

Parties have tried to raise these arguments about the application of Section 1797 in the federal courts. In ***Kansky v. Showman***, No. 3:09-CV-1863, 2011 WL 1362245, at *5 (M.D. Pa. filed April 11, 2011) (memorandum), the defendants sought to preclude expert testimony about future medical expenses pursuant to Section 1797. The plaintiff responded that the defendants had "presented no case law to support their position." ***Id.*** at *6.

- 24 -

In particular, the parties argued over the definition of the word "payable" as used in Section 1797(a): "Providers subject to this section may not bill the insured directly but must bill the insurer for a determination of the amount payable." The Middle District of Pennsylvania analyzed the issue as follows:

> The word "payable" in [Section 1797] can have many meanings, such as "owed, to be paid, due". Future medical payments are not currently due and outstanding. The defendants cannot guarantee that any future expenses will in fact be paid. It is merely speculation. For instance, plaintiff's insurer could become bankrupt, or deny future medical bills for a variety of reasons. We agree with the plaintiffs. Because the insurance benefits are not necessarily due and owing at this time and nothing could compel the insurer to pay a lump sum for future expenses, plaintiffs future medical bills are not "payable" under [Section 1797].

*Kansky*, No. 3:09-CV-1863, 2011 WL 1362245, at *6. We find the federal court's reasoning to be sound and would likewise find that the Section 1797 does not apply to future medical expenses. *Id.*

The Middle District of Pennsylvania had considered this topic earlier in *Walters v. Zumstein, Inc.*, No. 4:07-CV-0358, 2008 WL 11370033 (M.D. Pa. filed September 10, 2008) (memorandum). In that case, the defendant, Zumstein, sought "to preclude the introduction of evidence relating to the future medical expenses of plaintiff" Margaret Walters and, more significantly, "argue[d] that Walters' future medical expenses must be reduced in accordance with the cost-containment provisions . . . of the MVFRL, 75 Pa. C.S.[] § 1797." *Id.* at *1. The federal court denied Zumstein's motion, explaining:

> Granting Zumstein's motion would create the distinct possibility that Walters may be precluded from recovering future medical costs in this action and also be denied benefits for such costs by insurers in the future. The [c]ourt cannot adopt this interpretation of the statute. Therefore, the Court holds that Walters' future medical benefits, the payment of which, at this point, is purely speculative, do not fall within the scope of . . . § 1797.

*Id.* at \*3.

Thus, pursuant to our review of all available writings on this subject, we are persuaded by their analysis that the caps placed by 75 Pa.C.S. § 1797 on the amount a person or institution providing treatment to an injured person for an injury covered by insurance may charge for such treatment do not apply to future medical expenses. *See DeOrio*, No. 530 EDA 2006, at 18-20 (citing *Pittsburgh Neurosurgery*, 733 A.3d at 1284-85); *Kansky*, No. 3:09-CV-1863, 2011 WL 1362245, at \*5-\*6; *Walters*, No. 4:07-CV-0358, 2008 WL 1130033, at \*1, \*3. We therefore conclude that the trial court did not abuse its discretion by denying Appellants a new trial on damages where the damages awarded for future medical expenses were not reduced pursuant to 75 Pa.C.S. § 1797.

### Excessive Verdict

Finally, Appellants contend that "a new trial[9] on damages is required because the verdict is shockingly excessive and could only have been the result of passion, prejudice or other impermissible factors." Appellants' Brief at 55. Appellants continue that the verdict "is clearly beyond what the

---

[9] Our standard of review from a denial of a new trial, including a refusal of a new trial due to the excessiveness of the verdict, remains a clear abuse of discretion. *Tindall*, 970 A.2d at 1177; *ACE American Insurance*, 939 A.2d at 939.

evidence warrants" and that "the evidence does not support the jury's non-economic award to Mr. Farese." *Id.* at 55, 57 (citing Pa.R.C.P. 223.3). Appellants also take issue with the award for loss of consortium. *Id.* at 60.

A jury is given wide latitude to fashion a verdict on damages. *Neison v. Hines*, 653 A.2d 634 (Pa. 1995). The large size of a verdict by itself is not evidence of excessiveness. *Layman v. Doernte*, 175 A.2d 530 (Pa. 1961). Compensatory damages, the type of damages at issue in the instant case, compensate a party "to the full extent of the injury sustained." *Burke v. Valley Lines, Inc.*, 617 A.2d 1335, 1337 (Pa. Super. 1992).

In general, the instant case certainly has elements which would support the jury verdict (failure of Appellants to attend trial; minimizing Mr. Farese's injuries). As for Appellants' specific claims that the jury was motivated by "passion" and "prejudice[,]" Appellants' Brief at 55, the trial court's final charge to the jury was, "You should keep your deliberations free of any bias or prejudice[,]" N.T., 10/3/2016, at 169, and "[i]t is well settled that the jury is presumed to follow the trial court's instructions." *Cash*, 137 A.3d at 1280. Appellants merely speculate that the jury ignored this instruction, but, like the appellant in *Cash*, they did "not otherwise attempt to offer any evidence establishing that the jury failed to do so[.]" *Id.*

Similarly, Appellants rely on Pa.R.C.P. 223.3 in support of their assertion that the evidence does not support the jury's non-economic award to Farese. Appellants' Brief at 57. Pa.R.C.P. 223.3 states, in pertinent part:

> In any action for bodily injury or death in which a plaintiff has raised a claim for a damage award for noneconomic loss that is

viable under applicable substantive law, the court shall give the following instructions to the jury. . . .

> In considering plaintiff's claims for damage awards for past and future noneconomic loss, you will consider the following factors: (1) the age of the plaintiff; (2) the severity of the injuries; (3) whether the injuries are temporary or permanent; (4) the extent to which the injuries affect the ability of the plaintiff to perform basic activities of daily living and other activities in which the plaintiff previously engaged; (5) the duration and nature of medical treatment; (6) the duration and extent of the physical pain and mental anguish which the plaintiff has experienced in the past and will experience in the future; (7) the health and physical condition of the plaintiff prior to the injuries; and (8) in case of disfigurement, the nature of the disfigurement and the consequences for the plaintiff.

The record demonstrates that the trial court properly instructed the jury that it should consider each of these factors, with the exception of the eighth factor, which is inapplicable. **Compare** N.T., 10/3/2016, at 161-62, **with** Pa.R.C.P. 223.3. Again, "[i]t is well settled that the jury is presumed to follow the trial court's instructions"; Appellants did not "offer any evidence establishing that the jury failed to do so[.]" **Cash**, 137 A.3d at 1280.

Furthermore, there was evidence pursuant to each of these factors to support the verdict. Mr. Farese's age was 50 years old at the time of trial. N.T., 9/30/2016, at 55; Pa.R.C.P. 223.3 ("(1) the age of the plaintiff"). The second factor, "the severity of [Mr. Farese's] injuries[,]" Pa.R.C.P. 223.3, was established through copious medical expert testimony, including Dr. Fras's testimony that Mr. Farese had sustained a cervical disc herniation, aggravation of cervical and lumbar spondylosis, and an annular tear at L4-5. N.T., Fras Testimony, 7/29/2016, at 19, 25-26. Dr. Fras also testified that all of these injuries were directly related to the motor vehicle collision at issue. **Id.**; TCO,

filed September 6, 2018, at 31. Dr. Shaer agreed with Dr. Fras and clarified that the disc herniation was at C6-7. TCO, filed September 6, 2018, at 32 (citing N.T., Shaer Testimony, 5/24/2016, at 34). Dr. Sing concurred with these evaluations but also mentioned that Mr. Farese had a lower neck disc rupture. N.T., 9/28/2016, at 48.

As for the third Pa.R.C.P. 223.3 factor, "whether the injuries are temporary or permanent[,]" Dr. Cohen testified that, if a brain injury lasts more than one year, there is evidence to suggest this injury would be considered permanent. N.T., Cohen Testimony, 5/20/2016, at 26. Given that Mr. Farese was still experiencing symptoms more than two years after the collision, the jury therefore could have reasonably inferred that his injuries were permanent.

Evidence of the fourth Pa.R.C.P. 223.3 factor, "the extent to which the injuries affect the ability of [Mr. Farese] to perform basic activities of daily living and other activities in which [he] previously engaged[,]" again includes Mr. Farese's own testimony that his headaches force him to "put[] activities aside, even sleep" and that, prior to the collision, he was active, playing pick-up football games with his friends, working out at his home gym three times a week, running regularly, coaching his children in sports, and caring for his aging parents. N.T., 9/30/2016, at 58, 61, 63, 67, 100. He testified that he even has difficulty performing basic activities like picking up bags while food shopping and that his social activities, such as attending movies and family events, have been greatly reduced due to his constant concern that his

headaches will recur.  *Id.* at 93-94, 98; *see also* TCO, filed September 6, 2018, at 29.  The decrease in Mr. Farese's activities was corroborated by Mr. Farese's business partner, Piscitelli, who testified that, before the collision, he and Mr. Farese split the duties at their diner, including opening the diner in the mornings, seating customers, doing inventory, meeting with food suppliers, handling personnel issues, working the cash register, and interacting with the customers.  N.T., 9/30/2016, at 8, 11-12.  Piscitelli also testified that, after the collision, Mr. Farese had to miss work to go to specialists and physical therapy two to three times a week, causing Piscitelli to have to do the majority of the work at the diner and put in long hours, as Mr. Farese cannot do any heavy lifting or physical activities associated with his job at the diner.  *Id.* at 22, 24.

As for the fifth Pa.R.C.P. 223.3 factor, "the duration and nature of medical treatment[,]" Mr. Farese testified that, at the time of trial, he was still under the care of four doctors, including a sports medicine specialist, a spinal surgeon, a neurologist, and a pain management specialist.  N.T., 9/30/2016, at 89-90.  He further explained that he had to undergo physical therapy three times per week for seven months and was prescribed multiple medications. *Id.* at 75-76, 80.  One of those prescriptions, Cambia powder, made him severely nauseous, and even the mildest of the medications, Meloxicam, "made [his] stomach mildly upset[.]"  *Id.* at 81.  At the time of trial, he was still taking Meloxicam daily with food.  *Id.*  He also testified that he received injections at "the very base of your skull," which described as "not pleasant[.]"

*Id.* at 85.  As the trial court summarized – "There seems little doubt that Mr. Farese has been exposed to difficult medical interventions that would not have arisen except for the motor vehicle collision."  TCO, filed September 6, 2018, at 29.  Additionally, Mr. Farese's medical treatment is likely to continue in the future, as he testified that his spinal surgeon, Dr. Fras, informed him "that he may require both neck and back surgery in the future."  *Id.* (citing N.T., 9/30/2016, at 82).  Dr. Fras's testimony confirmed that Mr. Farese "is a surgical candidate and very well could require surgery" to both his neck and lower spine.  *Id.* at 31 (citing N.T., Fras Testimony, 7/29/2016, at 25).

As for the sixth Pa.R.C.P. 223.3 factor, "the duration and extent of the physical pain and mental anguish which the plaintiff has experienced in the past and will experience in the future[,]" Mr. Farese testified that he suffered a swollen left wrist and pain in his back, head, and neck after the collision.  N.T., 9/30/2016, at 71.  He described his headaches --

> as "being extremely profound to the point where [the headache] completely disables me.  I got to go lay down," and at other times as though his "skull was going to explode."  [N.T., 9/30/2016,] at 100.  Regarding his headaches, Mr. Farese stated they "could last the entire night.  Could last the entire day.  Couple very isolated incidents, I've had them an entire day, all day into night."  *Id.* Further, the headaches "interfere with everything.  It's very debilitating.["]

TCO, filed September 6, 2018, at 28.  He likewise described his neck pain as a "very stiff achy pain in his neck[,]" and, if he "move[s his] head too far in one direction, it sends shooting pain into [his] neck."  N.T., 9/30/2016, at 102-03.  Mr. Farese also gave testimony about his low back pain, including his difficulty sitting for long periods of time.  *Id.* at 103.  His "mental anguish"

--part of the sixth Pa.R.C.P. 223.3 factor -- is reflected in his testimony about how "his personal relationships have been significantly altered since the collision[,]" TCO, filed September 6, 2018, at 29 (citing N.T., 9/30/2016, at 92-94, 98), as well as Ms. Farese's testimony about Mr. Farese's agitation and "mood swings." N.T., 9/30/2016, at 46.

Mr. Farese's "health and physical condition . . . prior to the injuries" – the seventh Pa.R.C.P. 223.3 factor -- was again established by his testimony that, prior to the collision, he did not see any specialists for medical problems, was not taking any medication, and did not receive injections. N.T., 9/30/2016, at 67-68. He also stated that, before the collision, he "was in great physical health" and "never had any problems" or "an issue." *Id.* He added that "[t]he thing they mentioned about the degenerative things and whatnot. If anything was there, never experienced any sign of those problems before." *Id.* As the trial court put it: "Mr. Farese was, ostensibly, a reasonably healthy person before suffering injuries in the collision." TCO, filed September 6, 2018, at 28.[10]

As the trial court aptly summarized:

The jury had the opportunity to hear multiple witnesses for [Appellees] about the severity of his injury, the objective evidence to support the injury, the permanency of the injury, the ability to continue employment, and out-of-pocket expenses. The jury - after hearing all testimony and evidence - decided this was a just figure to award [Mr. Farese] in light of all relevant factors.

[Appellants] had opportunity to put on their own defense or present their own medical experts to contest [Appellees']

---

[10] As for the final Pa.R.C.P. 223.3 consideration, it only applies "in case of disfigurement," and there were no allegations of disfigurement in this action.

witnesses. Despite [Appellants'] counsel's numerous references during opening arguments that their own medical expert, Dr. Harris, would testify, this is an option [Appellants] - perhaps for their own strategic reasoning - ultimately elected not to exercise. [Appellants'] counsel explained that "it became pretty clear [to him] that [the jurors] have all paid close attention to all witnesses here, and I think you understand what's going on here, and I again saw no need to bring in another doctor." N.T. 10/03/2016 at 113. [Appellants] suffered no prejudice, the trial court did not abuse its discretion and, therefore, the jury award for damages was not excessive or shock the conscience.

TCO, filed September 6, 2018, at 34-35.

As for Appellant's specific contention that the jury's award for Ms. Farese's loss of consortium claim was excessive, Appellant's Brief at 60, we begin by noting that "damages for loss of consortium have no market value, and the amount awarded for loss of consortium is left to the sound judgment and common sense of the fact-finder." *Tindall v. Friedman*, 970 A.2d 1159, 1177 (Pa. Super. 2009) (citation and internal quotation marks omitted). A claim for loss of consortium is quite different from a claim for bodily injury. *Darr Construction Co. v. Workmen's Compensation Appeal Board (Walker)*, 715 A.2d 1075, 1080 (Pa. 1998). While the claim stems from a spouse's bodily injury, it is nevertheless a separate and distinct claim. *Id.* Loss of consortium is a **loss of services, society, and conjugal affection of one's spouse**. *Id.* One who has suffered a loss of consortium has not sustained a bodily injury but rather has experienced an injury to marital expectations. *Id.*

The trial court's instruction to the jury adequately reflected the elements of a loss of consortium claim. *Compare* N.T., 10/3/2016, at 162, *with Darr Construction*, 715 A.2d at 1080. Again, we presume that the jury followed

the trial court's instructions, ***Cash***, 137 A.3d at 1280, and Appellants did "not otherwise attempt to offer any evidence establishing that the jury failed to do so[.]" ***Id.***

Moreover, after a thorough review of the record, we conclude that Ms. Farese's testimony supported the jury's award to her for loss of consortium, as the trial court appropriately summarized:

> The jury found the evidence introduced by [Ms.] Farese to be persuasive, and found her credible. [Ms.] Farese testified as to how her husband's injuries impacted her relationship with her husband. The testimony ranged from how their social life has been impacted, to how Mr. Farese is not able to contribute to the household as before the collision, his mood swings, and the loss of physical intimacy.

TCO, filed September 6, 2018, at 36; ***see also*** N.T., 9/30/2016, at 46-48. Ms. Farese's testimony was corroborated by Mr. Farese, who discussed the negative impact his injuries have had on the social and emotional relationship between himself and his spouse. N.T., 9/30/2016, at 74, 91-94, 98.

The trial court opinion also comprehensively discussed Appellants' counsel's failure to address the consortium claim before the jury:

> It does not appear from the record that defense counsel once mentioned [Ms.] Farese's name throughout opening or closing arguments. During cross-examination of [Ms.] Farese, [Appellants'] counsel instead opted to focus his questions upon issues regarding Mr. Farese's injuries, medications, presence at medical appointments, his general health before and after the injuries, and the injuries' impact on Mr. Farese's employment. [Appellants] failed to meaningfully address the consortium claim during trial and should not now be able to redress a claim that went unanswered throughout the trial.

TCO, filed September 6, 2018, at 36-37 (citing N.T., 9/30/2016, at 50-54).

As the trial court concluded:

The jury was afforded proper instruction on the loss of consortium claim put forth by [Ms.] Farese. The jury awarded [Ms.] Farese $416,000.00 for her consortium claim. Because there is no market value for consortium claims or a requirement to prove the value with dollars and cents, the award was left to the sound judgment and common sense of the jury. [*Tindall*, 970 A.2d at 1177.] In their sound judgment, the jury decided that $416,000.00 was a just and equitable award. This is not a verdict for damages that is grossly excessive or shocks the conscience. Therefore, the noneconomic damages awarded to [Ms.] Farese[] was proper and within the bounds provided by law.

*Id.* at 37.

Overall, insofar as Appellants are displeased with the combined damages award received by Appellees or consider the total award to be excessive, the jury resolved all issues related to damages, and, provided there is any evidence to support the award, it is not for this or any court to substitute its judgment for that of the fact-finder, even if the court would have arrived at a different conclusion on the same facts. *See Neal v. Bavarian Motors, Inc.*, 882 A.2d 1022, 1029 (Pa. Super. 2005) ("if there is evidence in the record to support the award . . . , then this Court is not free to substitute its judgment by altering the award"); *Refuse Management Systems, Inc. v. Consolidated Recycling and Transfer Systems, Inc.*, 671 A.2d 1140, 1150 (Pa. Super. 1996) ("this court, on appeal, will not substitute its judgment for that of the fact-finder in the award of damages so long as the award is supported by competent evidence"); *see also Mader v. Duquesne Light Co.*, 199 A.3d 1258, 1264, 1267 (Pa. Super. 2018) (finding that, where trial court disrupted jury's award of future medical expenses, it "usurped the jury's fact-finding role and committed an abuse of discretion"; this Court hence reversed trial court's grant of new trial on damages). Appellants knew the

dangers and pitfalls of a jury trial when they requested one, and they must accept the consequences thereof.

Judgment affirmed.

Judge Kunselman joins the Opinion.

Judge Lazarus files a Dissenting Opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/8/19